1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **HARTFORD CASUALTY INSURANCE COMPANY,**<br><br>                              **Plaintiff,**<br><br>        **v.**<br><br>**AMERICAN DAIRY AND FOOD CONSULTING LABORATORIES, INC.,  and  DOES  1 through 10, inclusive,**<br><br>                      **Defendants.**<br>─────────────────────────────<br>**AMERICAN DAIRY & FOOD CONSULTING LABORATORIES, INC.,**<br><br>        **Counter-Claimant,**<br><br>        **v.**<br><br>**HARTFORD CASUALTY INSURANCE COMPANY,**<br><br>        **Counter-Defendant.** | **09-CV-00914-OWW-DLB**<br><br>**MEMORANDUM    DECISION    RE: PLAINTIFF'S      MOTION      TO DISMISS UNDER RULE 9(b)  AND 12(b)(6)** |

**I.   INTRODUCTION**

     Before the court is a motion to dismiss filed by Plaintiff Hartford Casualty Insurance Company ("Hartford") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The motion is directed at two counterclaims asserted by Defendant American Dairy & Food Consulting Laboratories, Inc. ("American Dairy").  The following background facts are taken from Hartford's First Amended Complaint ("FAC") and American Dairy's pleading which contains the counterclaims at issue.[1]

─────────────────────

     [1]  Although, in this motion, Hartford's FAC is not under attack, the allegations in the FAC are included in the background section to put American Dairy's counterclaims in context.

1

### II.   BACKGROUND

This case arises out of an insurance policy Hartford issued to American Dairy.   American Dairy sustained loss it believed was covered by the policy and it submitted an insurance claim to Hartford for over five million dollars.   Hartford denied coverage.

**A.   The Parties**

Hartford is an Indiana corporation with its principal place of business in Hartford, Connecticut.   American Dairy is a Colorado corporation with its principal place of business in Denver, Colorado.   Diversity of citizenship is the alleged basis of subject matter jurisdiction. (Doc. 6 at 1-2; Doc. 9 at 2.)

**B.   Hartford's FAC**

Hartford initiated this lawsuit by complaint for declaratory relief filed against American Dairy on May 22, 2009.   Hartford then filed its FAC for declaratory relief on May 27, 2009.   Hartford seeks a declaration that American Dairy's loss is not covered by its insurance policy.

**1.   General Allegations**

**a.   The Policy, Loss And Denial Of Coverage**

In May 2007, American Dairy purchased a business insurance policy ("Policy") from Hartford to insure against loss at two properties ("Property") owned by American Dairy.   On or around May 28, 2008, American Dairy notified Hartford that a loss attributable to vandalism and theft occurred at the Property on May 14, 2008 ("Claim").   American Dairy provided Hartford with a "Sworn Statement in Proof of Loss" and an "Addendum" claiming $5,642,299.00 in covered loss, less a $5,000 deductible. (Doc. 6 at 2-3 & Ex. A.)

2

On February 24 and 25, 2009, Hartford examined, under oath, Dr. Mali Reddy, the President of International Media and Cultures ("IMAC") and American Dairy, Mrs. Syama Reddy, the Vice-President of IMAC and American Dairy, and Mrs. Marlene Basta, Head of Accounting and Administration of IMAC and American Dairy. American Dairy is alleged to be wholly owned by IMAC. During the examinations, Hartford allegedly learned that American Dairy never operated on or otherwise occupied the Property. Accordingly, Hartford denied coverage under an exclusion relating to "Vacancy." (*Id*. at 3 & Ex. B.)

The Policy (Doc. 6, Ex. A) advises the insured: "Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered." Section "E" of the Policy, entitled "PROPERTY LOSS CONDITIONS," contains a subsection on vacancy which excludes coverage for certain losses when the property is vacant.

8. Vacancy

    a. Description of Terms

        (1) As used in this Vacancy Condition, the term building and the term vacant have meanings set forth in Paragraphs (a) and (b) below:

            (a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

            (b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

3

      (i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

      (ii) Used by the building owner to conduct customary operations.

  (2) Buildings under construction or renovation are not considered vacant.

  b.   Vacancy Provisions

      If the building where physical loss or physical damage occurs has been vacant for more than 60 consecutive days before that physical loss or physical damage occurs:

  (1) We will not pay for any physical loss or physical damage caused by any of the following even if they are Covered Causes of Loss:

      (a)  Vandalism;

      (b)  Sprinkler leakage, unless you had protected the system against freezing;

      (c)  Building glass breakage;

      (d)  Water damage;

      (e)  Theft; or

      (f)  Attempted theft.

  (2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the physical loss or physical damage by 15%.

As stated in Hartford's letter denying coverage, which is attached to Hartford's FAC, Hartford determined that American Dairy's Property was vacant for Policy purposes. (Doc. 6, Ex. B.) According to Hartford, for more than sixty (60) consecutive days preceding the loss, at least 31% of the Property's total square footage was not used by American Dairy or any lessee to conduct customary operations.  Hartford also determined that the Property was not "under construction or renovation" under the Policy because

**4**

"no physical alteration of any kind or even basic maintenance had been performed at the Property since American Dairy acquired it." Given the Property's vacant status, the claimed loss on the Property caused by vandalism and theft was not covered. (*Id.* at 4.)

Although Hartford expressly denied coverage pursuant to the Vacancy Provisions, in Hartford's letter denying coverage, Hartford stated that it "expressly reserve[d]" the "right to assert any other policy terms, conditions, exclusions, exceptions, or legal defenses to coverage that we might later learn may be applicable to the claimed loss." (*Id.* at 4.) The letter also contains Hartford's specific reservation to assert that the "Concealment, Misrepresentation or Fraud" provision in the Policy permits Hartford to void or rescind the Policy and/or deny the claim. (*Id.* at 4-6.) This provision reads:

> This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1.   This policy;
>
> 2.   The Covered Property
>
> 3.   Your interest in the Covered Property; or
>
> 4.   A claim under this policy.

According to Hartford, American Dairy may have made material misrepresentations in the application for the Policy "by indicating that American Dairy had been engaged in dairy operations at the Property" as "several answers on the application . . . represent that there had been . . . ongoing dairy production at the Property." American Dairy may have also "concealed and/or misrepresented the occurrence of the loss" and may have "materially

**5**

overstated the amount of the loss with respect to its claim for extra expenses sustained due to vandalism, the loss of business income, business personal property, and the extent of repairs necessary to repair the vandalism damage." (*Id.* at 5-6.) Accordingly, in its letter denying coverage, Hartford specifically reserved its right to void or rescind the Policy and/or deny the claim under the Concealment, Misrepresentation or Fraud provision. (*Id.* at 4-6.)

### 2.   Hartford's Claims In The FAC

Hartford's FAC asserts two claims for declaratory relief. Hartford's first claim for declaratory relief requests a declaration that, by virtue of the Vacancy Provisions, the Claim is not covered by the Policy and Hartford owes nothing to American Dairy for the Claim. (Doc. 6 at 5-6.)  Hartford's second claim for declaratory relief relates to its reservation of rights.  Hartford alleges that, in its letter denying coverage, it reserved the right to rescind or void the Policy and/or to deny the Claim based on alternate grounds contained in the Policy.  Hartford requests a declaration that it is entitled to "void or rescind the Policy and/or to deny the Claim based on these alternate grounds." (Doc. 6 at 6-7.)

### C.   American Dairy's Counter-Complaint

After Hartford denied the Claim and filed its FAC, on July 24, 2009, American Dairy filed an answer (Doc. 8) and a separate document (Doc. 9) asserting four counterclaims against Hartford for breach of written contract, breach of the implied covenant of good faith and fair dealing, "negligent misrepresentation," and "reformation/unilateral mistake."  American Dairy's counterclaims

6

for negligent misrepresentation and reformation/unilateral mistake are the only counterclaims at issue in this motion.

    **1.**   **General Allegations In The Counter-Complaint**

        **a.**   **American Dairy's Prior Relationship With Hartford**

According to American Dairy, before it purchased the Policy from Hartford, American Dairy established a relationship with Hartford's authorized agent, Renaissance Insurance Group, LLC and specifically "J. Helzer" who became familiar with American Dairy's insurance needs and requirements.   At all materials times, Renaissance and Helzer were allegedly acting on behalf of their disclosed principal, Hartford. (Doc. 9 at 2.)

        **b.**   **Hartford's Knowledge Regarding American Dairy's Future Use Of The Property And Assurance Of Coverage**

According to American Dairy, Hartford knew that American Dairy intended to acquire the Property for its "future manufacturing and processing activities."   At the time American Dairy purchased the Property, Hartford was aware that "substantial renovation and modifications" to the Property "would be necessary before any manufacturing and processing of dairy products could occur." (*Id.* at 3.)   American Dairy informed Hartford that it would take time to obtain proper permits from government authorities for the renovation/construction that it had planned.   American Dairy was assured that the Policy would provide it with complete coverage. As alleged:

    8.   In connection with AMERICAN DAIRY's efforts to make sure it had adequate and proper insurance in place on THE PROPERTY, AMERICAN DAIRY contacted Renaissance Insurance Group, LLC and J. Helzer and explained AMERICAN DAIRY's needs for insurance to be in place and in effect from the date of AMERICAN DAIRY's purchase of THE PROPERTY. Thereafter, with the advice, recommendation and assistance of HARTFORD's authorized and appointed agent,

AMERICAN DAIRY purchased a written commercial property policy, number 34SBA UI6658 from HARTFORD with the understanding that it would provide full and complete coverage for losses that might be sustained to THE PROPERTY, including losses resulting from theft or vandalism.

9.   At the time the written policy was purchased from HARTFORD, AMERICAN DAIRY made it clear that it would take some time to obtain proper permits from the governing authorities to allow for the needed renovations and construction to modify THE PROPERTY for the anticipated manufacturing and processing operations on THE PROPERTY. HARTFORD's authorized and appointed representatives and agents repeatedly assured AMERICAN DAIRY that the policy purchased from HARTFORD would provide full and complete coverage to AMERICAN DAIRY for losses that might be sustained to THE PROPERTY, notwithstanding the fact that no manufacturing or processing activities were ongoing, and notwithstanding the fact that the construction or renovation efforts might be delayed during the time in which AMERICAN DAIRY was required to wait for the proper permits to be issued by the governmental authorities. At no time prior to the loss which occurred in May 2008, did anyone from HARTFORD ever advise or alert AMERICAN DAIRY to the fact that there was a limitation in the policy which HARTFORD would contend applied to preclude coverage for losses caused by theft or vandalism if THE PROPERTY was not used for manufacturing and/or processing purposes for a period of more than 60 consecutive days. Moreover, based on the representations made by HARTFORD and its authorized and appointed agents and representatives, AMERICAN DAIRY reasonably believed that no such limitation existed within the policy and would have expected the HARTFORD representative and appointed agents to alert AMERICAN DAIRY to any such limitation in light of the information AMERICAN DIARY disclosed to HARTFORD and its representatives and appointed agents about its insurance needs.

10.   During the course of AMERICAN DAIRY's efforts to purchase insurance from HARTFORD, AMERICAN DAIRY relied on HARTFORD's appointed and authorized agents and representatives, including having such representatives complete the appropriate insurance application forms. Specifically, the authorized HARTFORD representatives and agents filled out the applicable insurance application form without specifically seeking AMERICAN DAIRY's input, and simply submitted the application to AMERICAN DAIRY without receiving substantial input from AMERICAN DAIRY.

(*Id.* at 3-4.)   After Hartford issued the Policy and before it expired, Hartford conducted an on-site inspection of the Property.

**8**

### c.   Hartford Inspects The Property

While the Policy was in effect, Hartford arranged for and inspected the Property on April 9, 2008. During the investigation, American Dairy discussed its efforts to obtain the necessary permits for its continued renovation and construction activities. During the inspection, Hartford did not indicate that the Property was vacant or that a condition on the Property would limit coverage.

11.   After the policy was issued, and during the time in which the policy was in effect, HARTFORD advised AMERICAN DAIRY that it intended to conduct an on-site inspection of THE PROPERTY for the express purpose of helping AMERICAN DAIRY avoid property losses. HARTFORD advised that it intended to review 'common things that cause such losses and identifying controls that could help reduce the potential for occurrence.' As a result, HARTFORD arranged for an inspection to occur on April 9, 2008 at THE PROPERTY by HARTFORD's representative, Adam Bromhead.

12.   Prior to conducting the April 9, 2008 inspection, HARTFORD advised that it intended to discuss the operations conducted in the buildings, and describe regular and preventive maintenance practices for the buildings and equipment.

13.   . . . At no time during the April 9, 2008 inspection did the HARTFORD representative indicate that there were any noticed problems at THE PROPERTY. . . . At no time during the inspection did Mr. Bromhead suggest or indicate in any way that the condition of, or AMERICAN DAIRY's use of the pro9perty [sic], impacted or impaired AMERICAN DAIRY's scope of coverage under the HARTFORD policy.

14.   During the April 9, 2008 inspection, representatives from AMERICAN DAIRY fully and completely responded to all questions posed of them by Mr. Bromhead, including the details of AMERICAN DAIRY's efforts to obtain necessary permits to allow for the continued renovation and construction activities to THE PROPERTY. At no time during the inspection did Mr. Bromhead ever indicate that he thought THE PROPERTY was vacant or that any condition of THE PROPERTY increased the risk of potential loss because of vandalism or theft. At no time during the inspection did Mr. Bromhead indicate that because of any condition of THE PROPERTY coverage might be limited in any way if a loss occurred because of theft or vandalism.

9

At no time during the meeting did Mr. Bromhead indicate that AMERICAN DAIRY should increase its activities at THE PROPERTY in order to reduce the potential losses from vandalism or burglary, or otherwise undertake any effort to make sure that its coverage was maximized during the time in which AMERICAN DAIRY was waiting for its permits to be approved.

15. Based on HARTFORD expressly and specifically advising AMERICAN DAIRY, in advance of the April 9, 2008 meeting, that HARTFORD was conducting the inspection for the purpose of helping AMERICAN DAIRY avoid property losses and reduce potential for such losses, AMERICAN DAIRY relied on HARTFORD to alert AMERICA[N] DAIRY to potential losses that might exist due to the condition and use of its property as of the time of the inspection. In addition, AMERICAN DAIRY relied on and expected HARTFORD to help AMERICAN DAIRY, including alerting AMERICAN DAIRY to any potential coverage problems that might exist due to the condition or the use of THE PROPERTY at the time of the April 9, 2008 inspection.

16. Based on the representations HARTFORD made prior to, and during the April 9, 2008 [] inspection, AMERICAN DAIRY expected that if there were any problems in the condition or manner in which THE PROPERTY was being operated and/or used at the time of the inspection, HARTFORD would have alerted AMERICAN DAIRY to the situation so that AMERICAN DAIRY could do what was necessary to protect THE PROPERTY from potential losses and otherwise secure coverage under the HARTFORD policy.

(*Id.* at 4-5.)

After the inspection, Mr. Bromhead reported that the inspection went well and Hartford sent American Dairy a renewal policy for the Property.

17. Following the April 9, 2008 inspection, Mr. Bromhead called AMERICAN DAIRY and confirmed that the inspection had gone well and that HARTFORD would be sending a renewal policy extending coverage for the following year. At no time during this telephone conversation did Mr. Bromhead indicate that there was any potential loss exposure or that AMERICAN DAIRY's current condition, operations and use of THE PROPERTY created any increased risk or coverage problems under the HARTFORD policy.

18. A few days after the April 16, 2008 telephone conversation from Mr. Bromhead, AMERICAN DAIRY received a renewal policy from HARTFORD confirming coverage being extended for the policy period May 23, 2008 through May 23, 2009. The renewal policy was dated April 18, 2008.

10

(*Id.* at 6.)  Subsequently, Hartford issued a notice of cancellation indicating that the renewal policy would be cancelled effective July 12, 2008, for the stated reason that the Property was vacant. (*Id.*)

### d.   Hartford Cancels The Renewal Policy, Coverage Remains In Effect And Theft And Vandalism Occurs

On April 21, 2008, American Dairy received Hartford's notice of cancellation regarding the renewal policy.  Even though Hartford based its cancellation decision on the Property's vacancy, Hartford did not indicate whether this vacancy status also impacted American Dairy's then existing coverage which remained in effect until July 12, 2008.  American Dairy believed it was still fully covered.

20.   Notwithstanding HARTFORD's representation that the inspection went well, and that it was agreeable to renewing AMERICAN DAIRY's policy for the following year, on April 21, 2008 AMERICAN DAIRY received a notice of cancellation indicating that the renewal policy was being canceled which would become effective July 12, 2008. The reason stated for the cancellation was that both buildings on THE PROPERTY were vacant. This notice did not indicate or suggest that the fact that the buildings might be vacant would in any way impair AMERICAN DAIRY's right to obtain benefits from any covered losses, such as burglary or vandalism.

21.  Upon receiving the April 21, 2008 notice of cancellation, AMERICAN DAIRY was confused and did not understand why HARTFORD would issue such a notice, based on the statements made during the April 9, 2008 inspection, and the discussions following said inspection.

22.  Thereafter, AMERICAN DAIRY contacted HARTFORD's authorized representative and agent, Renaissance Insurance Group, LLC and specifically J. Helzer who indicated that he did not agree with HARTFORD's determination that the buildings were vacant, but that he would undertake efforts to secure replacement insurance coverage. In accordance with the information contained within the notice of cancellation, Renaissance Insurance Group, LLC and specifically J. Helzer, assured AMERICAN DAIRY that THE PROPERTY would continue to be fully and completely insured with HARTFORD until July 12, 2008. At no time prior to the loss of May 2008, did anyone from

1
2
3

> HARTFORD, or its representatives or authorized agents,
> advise or otherwise alert AMERICAN DAIRY to the fact that
> HARTFORD's determination that THE PROPERTY was vacant
> could significantly impair the coverage provided under
> the policy.

4
5
6
7
8

> 23.  In fact, based on the notice of cancellation
> indicating that coverage would remain in effect until
> July 12, 2008, the representations made by HARTFORD both
> before and during the April 9, 2008 inspection, and the
> representations and promises made to AMERICAN DAIRY by
> HARTFORD's authorized agents and representatives
> following the inspection, AMERICAN DAIRY believed that it
> had full and complete coverage for losses that might be
> sustained to THE PROPERTY including losses resulting from
> theft or vandalism.

9
10
11
12
13

(Id. at 6-7.)   While the Policy was still in effect, theft and
vandalism occurred on the Property.   In early to mid May 2008,
American Dairy discovered that the Property suffered "substantial
and catastrophic damages as a result of . . . criminal activities
(theft and vandalism) by third parties." (*Id.* at 7.)

14

> e.   American Dairy Tenders The Claim

15
16
17
18
19

American Dairy tendered its Claim to Hartford and, initially,
Hartford indicated it would pay on the Claim.   Upon a further
"investigation," however, Hartford denied coverage.   American Dairy
faults Hartford for not advising it about a potential lack of
coverage and questions its "result-oriented" investigation.

20
21
22

> 26.  After tendering the claim to HARTFORD, HARTFORD
> initially indicated that the loss would be fully covered
> and paid. In addition, on July 1, 2008 HARTFORD stated,
> in writing, that it needed no further information from
> AMERICAN DAIRY to proceed with the claim.

23
24
25

> 27.  However, HARTFORD subsequently commenced further
> investigation which, and on information and belief,
> AMERICAN DAIRY alleges that the investigation was
> designed for the purpose of creating a basis to avoid
> paying the claim.

26
27
28

> 28.  Under the terms of the written policy, number 34SBA
> UI6658, HARTFORD agreed to pay for losses to THE PROPERTY
> such as losses resulting from burglary and vandalism. At
> no time prior to the May 2008 loss did anyone from

**HARTFORD, or its representatives or authorized agents, specifically inform or advise AMERICAN DAIRY that if the governmental authorities delayed in providing necessary permits, it could have a negative impact on or otherwise impair their ability to receive insurance benefits should AMERICAN DAIRY suffer a loss from burglary or vandalism. In fact, AMERICAN DAIRY believed that its efforts in obtaining the permits from the governmental authorities was part of their efforts to renovate and modify the buildings in accordance with their anticipated manufacturing and processing operations. Indeed, at no time prior to the May 2008 loss did anyone from HARTFORD or its representatives and authorized agents, ever advise AMERICAN DAIRY that its renovation and modification efforts would not include the time and effort during which AMERICAN DAIRY sought and was waiting to receive necessary permits from the governing authorities.**

**. . . .**

**30. Rather than provide AMERICAN DAIRY with the insurance benefits to which it was entitled on a timely basis following the May 2008 theft and vandalism loss, HARTFORD engaged in activities designed to deprive AMERICAN DAIRY of receiving full, complete and timely benefits. HARTFORD's activities in 'investigating' the claim fell below the insurance industry standards for the proper handling and adjustment of claims by, among other things, misrepresenting the facts, policy provisions and circumstances of HARTFORD's investigation, with the intent and purpose of depriving AMERICAN DAIRY of the full and complete benefits to which it was entitled; failing to timely and substantively respond to communications and inquiries received from AMERICAN DAIRY regarding its claim for benefits; deliberately refusing to treat AMERICAN DAIRY's interests at least equal to HARTFORD's interests during the handling and adjustment of its claim; deliberately disregarding information AMERICAN DAIRY provided to HARTFORD in its efforts to wrongfully deprive AMERICAN DAIRY of the benefits to which it was entitled; deliberately failing and refusing to conduct a fair, objective and full investigation of the facts and circumstances and instead engaging in a result-oriented handling of the claim with the intent to deny and deprive AMERICAN DAIRY of the full, complete and timely benefits to which HARTFORD knew were due and owing to AMERICAN DAIRY under policy number 34SBA UI6658; and deliberately disregarding information which established AMERICAN DAIRY's rights to receive payment under policy number 34SBA UI6658 for the May 2008 loss it sustained.**

(*Id.* at 8-9.)  After the Claim was denied, and after Hartford filed

its FAC, American Dairy filed its answer and counterclaims against

Hartford.

**2.   American Dairy's Counterclaims**

American Dairy's counterclaims are based on different assumptions as to the Policy's coverage of the Claim.  The first counterclaim for breach of contract assumes that the Claim is, in fact, covered under the Policy.  Hartford is allegedly "contractually required" under the Policy "to pay for the losses sustained" to the Property but has failed to do so. (*Id*. at 9.) Similarly, the second counterclaim also assumes that the Claim is covered by the Policy.  In its second counterclaim, American Dairy alleges that Hartford breached the implied covenant by, among other things, "denying AMERICAN DAIRY'S claim without proper cause or legitimate basis, with the intended and specific purpose of harming AMERICAN DAIRY and depriving AMERICAN DAIRY of the benefits to which HARTFORD knew were due and owing to AMERICAN DAIRY." (*Id*. at 11.)   In contrast, the third counterclaim for negligent misrepresentation and the fourth counterclaim for reformation/unilateral mistake do not assume the Claim is covered by the Policy.

**a.   Negligent Misrepresentation**

At the outset of its Negligent Misrepresentation counterclaim, American Dairy incorporates all its preceding allegations and then asserts that "if for any reason" the Policy "did not provide" it with "the expected and represented insurance protection," the "failure to obtain a policy which would cover such circumstances is a direct result of the misrepresentation of Hartford and its authorized and appointed agents and representatives." (*Id.* at 13.)

In several paragraphs, American Dairy then explains how, both

**14**

before and after American Dairy purchased the Policy, "representations" were made by Hartford's appointed and authorized agents and representatives, and American Dairy relied upon these representations to its detriment.

52.  HARTFORD's authorized and appointed representatives and agents knew, or in the exercise of due and reasonable care, should have known that AMERICAN DAIRY desired and expected an insurance policy which would provide coverage sufficient to protect them in the event they suffered a loss from burglary or vandalism during the time in which they were waiting to obtain the required permits from the governmental authorities.

53.  Through the representations and conduct of HARTFORD's authorized and appointed agents and representatives, AMERICAN DAIRY purchased policies and paid premiums to HARTFORD in good faith and belief that it was obtaining adequate commercial property insurance to protect it in the event of a loss such as what occurred in May 2008.

54.  AMERICAN DAIRY believed that the representations of HARTFORD's authorized and appointed agents and representatives were true, and in reliance thereon, AMERICAN DAIRY purchased its insurance policies from HARTFORD.

55.  Had AMERICAN DAIRY known the true facts, to wit, that the policies and insurance they were purchasing from HARTFORD might have limited property loss protection in the event of vandalism or burglary, while AMERICAN DAIRY was waiting to obtain the necessary permits from the governmental authorities, they would have undertaken additional actions and efforts to make sure that losses resulting from burglary or vandalism would be adequately and properly insured.

56.  AMERICAN DAIRY reasonably and justifiably relied on the representations, promises and statements made by HARTFORD and its authorized representatives and agents because HARTFORD and its authorized representatives and agents represented that they had superior knowledge and were in a superior position to provide expert advice and recommendations to AMERICAN DAIRY.

57.  Based upon the representations, promises and statements made by HARTFORD and its authorized representatives and agents, AMERICAN DAIRY was induced to purchase policies from HARTFORD and pay the required premiums, reasonably believing that the coverage being purchased would provide full and complete coverage for

**AMERICAN DAIRY in the event of loss, such as vandalism and burglary, even though AMERICAN DAIRY's property may not have been being used in the anticipated manufacturing processing operations for an extended period of time (more than 60 days) while their renovation and construction activities were the subject of delays pending receiving proper permits from the governmental authorities. Had AMERICAN DAIRY known the true facts, and/or known that actions could have been taken to eliminate the impairment of coverage purportedly caused by the vacancy condition of the policy, AMERICAN DAIRY would have taken such action to make sure that full and complete coverage was available for all potential losses that might occur, including but not limited to vandalism and burglary.**

**58.   In addition, after the policy was issued, and based on the representations and promises made in advance of and during the April 9, 200[8] inspection, AMERICAN DAIRY was lead to believe that if AMERICAN DAIRY's current use and/or operation of THE PROPERTY increased the risk of loss or otherwise created a problem for coverage, HARTFORD would have clearly and explicitly alerted and advised AMERICAN DAIRY of the problem and provided AMERICAN DAIRY with advice as to how best to address the problem. As a result AMERICAN DAIRY relied on HARTFORD to advise and make recommendations to AMERICAN DAIRY, and when HARTFORD failed to do so, AMERICAN DAIRY reasonably believed no problem existed.**

(*Id.* at 13-15.)   As a result of this "conduct of HARTFORD," American Dairy has been damaged. (*Id.* at 15.)

### b.   Reformation/Unilateral Mistake

At the outset of its fourth counterclaim for reformation/unilateral mistake American Dairy incorporates all previous allegations.  American Dairy then asserts that any lack of coverage is due to a unilateral mistake:

**61.   To the extent it is determined that the HARTFORD policy does not provide coverage for AMERICAN DAIRY's May 2008 loss, it fails to reflect the true intent and agreement of the parties which is the result of a unilateral mistake on the part of AMERICAN DAIRY in that it was unaware that the terms of the policy, as written, did not correctly express the terms intended and agreed to by the parties and as confirmed and agreed to by HARTFORD's authorized agents and representatives.**

**62.   AMERICAN DAIRY reasonably believed and expected that**

16

> the HARTFORD policy would contain complete coverage for property losses, such as burglary and vandalism losses, notwithstanding the fact that AMERICAN DAIRY's manufacturing and processing operations were delayed pending the required modifications and renovations to THE PROPERTY, and notwithstanding the fact that its renovation and modification efforts might be delayed for a period of more than 60 days pending obtaining necessary permits from the governmental authorities.

(*Id.* at 15.)  American Dairy also asserts that Hartford was aware of "the unilateral mistake":

> 63.   HARTFORD, and/or its authorized agents and representatives knew of the unilateral mistake at the time the HARTFORD policy was negotiated because it knew that the renovation and construction activities would take longer than 60 days to complete, and were in fact taking longer than 60 days to commence because of the need to obtain required permits from the governmental authorities.

(*Id.* at 16.)  To date, Hartford has "refused" to pay American Dairy despite "what the true intentions of the parties were when AMERICAN DAIRY purchased insurance from HARTFORD." (*Id.*)  In its prayer for relief, American Dairy requests a reformation of the Policy to provide coverage for the Claim:

> 6.   To the extent the Court finds that the express terms of the policy do not provide coverage for the May 2008 loss, [American Dairy prays] for an order that the policy be reformed to provide such coverage in accordance with the representations made by HARTFORD and/or its authorized representatives and agents that the policy would provide coverage for losses, including vandalism and burglary losses, notwithstanding the fact that ongoing operations had been delayed more than 60 days and that AMERICAN DAIRY's renovation and modification efforts were being delayed pending receiving the required permits from the governmental authorities[.]

(*Id.*)  American Dairy does not plead any claim for mutual mistake.

D.    Hartford's motion

On September 8, 2009, Hartford filed a motion to dismiss American Dairy's counterclaims for negligent misrepresentation and reformation/unilateral mistake, and no others.   Hartford argues

that these two counterclaims are not pled with the specificity required by Rule 9(b) and therefore must be dismissed for failure to state a claim under Rule 12(b)(6). Hartford also argues that the fourth counterclaim for reformation/unilateral mistake, which is premised on a lack of coverage under the Policy, is not properly pled in the alternative and thus contradicts American Dairy's claim for breach of contract, which is premised on the existence of coverage.

In its opposition brief, American Dairy argues that both counterclaims are sufficiently pled. In addition, American Dairy contends that its counterclaim for reformation/unilateral mistake should be construed as pled in the alternative. In the event that Hartford's motion has merit, American Dairy requests leave to amend to correct any deficiency or inconsistency in its pleading. At oral argument on the motion, American Dairy offered to amend its pleading to address the issues raised in Hartford's briefing. American Dairy was given until December 24, 2009, to file an amended pleading and neither party reached the substance of the motion at oral argument.

III.   STANDARDS OF DECISION

A.   <u>Rule 12(b)(6)</u>

Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To sufficiently state a claim to relief and survive a 12(b)(6) motion, the pleading "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

18

*Twombly*, 550 U.S. 544, 555 (2007).  Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.*  Rather, there must be "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  In other words, "[t]o survive a motion to dismiss, a complaint [or counter-complaint] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  The Ninth Circuit has summarized the governing standard, in light of *Twombly* and *Iqbal*, as follows: "In sum, for a [pleading] to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).[2]

In deciding whether to grant a motion to dismiss, the court must accept as true all "well-pleaded factual allegations" in the pleading under attack. *Iqbal*, 129 S. Ct. at 1950.  A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

_____

[2]  Apart from factual insufficiency, a complaint or counter-complaint is also subject dismissal under Rule 12(b)(6) where it lacks a cognizable legal theory, *Balistreri*, 901 F.2d at 699, or where the allegations on their face "show that relief is barred" for some legal reason. *Jones v. Bock*, 549 U.S. 199, 215 (2007); *see also Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001).

(9th Cir. 2001); *see, e.g., Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009). Nor is a court required to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell*, 266 F.3d at 988. In a motion to dismiss, "[a] court may . . . consider certain materials-documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice-without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**B.    Rule 9(b)**

In terms of factual sufficiency, Rule 9(b), when it applies, imposes an even higher pleading standard than facial plausibility. Rule 9(b) states:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud." *Swartz v. KMPG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Id.* (internal quotation marks omitted). The "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is

false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis removed).

Rule 9(b) also "provides for greater particularity in all averments of . . . mistake." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). General allegations of mistake are not sufficient. *N.Y., New Haven, & Hartford R.R. Co. v. New England Forwarding Co.*, 119 F. Supp. 380, 382 (D.R.I. 1953). The pleading must set forth enough facts to apprise the adversary of the particular "circumstances constituting" the claimed mistake. Fed. R. Civ. P. 9(b). Particulars such as the precise nature of the misunderstanding, when the mistake occurred, and which individual(s) made the mistake, have been required. *See, e.g., Mills v. Everest Reinsurance Co.,* 410 F. Supp. 2d 243, 248 (S.D.N.Y. 2006).

When a claim for fraud or mistake is insufficiently pled under Rule 9(b), the claim is treated as being subject to dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See Vess*, 317 F.3d at 1107-08.

C.   Rule 8(d)

Under federal pleading rules, a party may plead claims in the alternative. *See* Fed. R. Civ. P. 8(d)(2). While parties "need not use particular words to plead in the alternative, they must use a formulation from which it can be reasonably inferred that this is what they [are] doing." *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000). Under Rule 8(d)(3), a party can plead "as many separate claims" as it has "regardless of consistency" between them. Fed. R. Civ. P. 8(d)(3).

1    Although a party is authorized to assert alternative and
2    inconsistent claims, Rule 8(d)'s liberality "has its limits."
3    *Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*, 252
4    F. App'x 123, 126 (9th Cir. 2007). For example, if a pled claim is
5    internally inconsistent with itself, the inconsistencies may cancel
6    each other out and render the claim subject to dismissal for
7    failure to state a claim. *See, e.g., Maloney v. Scottsdale Ins.*
8    *Co.*, 256 F. App'x 29, 31-32 (9th Cir. 2007). While Rule 8 gives
9    the pleader some leeway, "no authority is known . . . which permits
10   blowing hot and cold in the same cause of action." *Steiner v.*
11   *Twentieth Century-Fox Film Corp.*, 140 F. Supp. 906, 908 (S.D. Cal.
12   1953).

## IV.   DISCUSSION AND ANALYSIS

13
14   **A.   Negligent Misrepresentation Claim**

15       Numerous courts in the Ninth Circuit have recognized, and the
16   parties   do   not   dispute,   that   a   claim   for   negligent
17   misrepresentation is subject to Rule 9(b). *See United Gaur.*
18   *Mortgage Indem. Co. v. Countrywide Fin. Corp.,* __ F. Supp. 2d. __,
19   2009 WL 3199844, at *10 (C.D. Cal. Oct. 5, 2009); *Phillips v.*
20   *Mortgage Elec. Registration Sys.*, No. 1:09-CV-01028-OWW-SMS, 2009
21   WL 3233865, at *6 (E.D. Cal. Oct. 2, 2009); *Meridian Project Sys.,*
22   *Inc. v. Hardin Constr. Co.*, *LLC*, 404 F. Supp. 2d 1214, 1219 (E.D.
23   Cal. 2005); *Neilson v. Union Bank of Cal.*, *N.A.*, 290 F. Supp. 2d
24   1101, 1141 (C.D. Cal. 2003). "Under California law, negligent
25   misrepresentation is a species of actual fraud." *Lorenz v. Sauer,*
26   807 F.2d 1509, 1511-12 (9th Cir. 1987); *see also Kolodge v. Boyd*,
27   88 Cal. App. 4th 349, 372 (2001).

28       Applying Rule 9(b), Hartford argues that American Dairy's

1  counterclaim for negligent misrepresentation is insufficiently

2  pled. Hartford contends that American Dairy fails to identify the

3  necessary details such as the "who, what, when, and where" of the

4  misconduct. According to Hartford, American Dairy has not

5  specifically identified the person who made the alleged

6  misrepresentations, who heard them, the content of the

7  misrepresentations, why they are false, and when the

8  misrepresentations (other than the April 9, 2008) occurred.

9      The allegations asserted in the negligent misrepresentation

10  claim do, in fact, lack sufficient detail. American Dairy's

11  counterclaim reads in part:

12      53. Through the *representations and conduct of
        HARTFORD's authorized and appointed agents and
13      representatives*, AMERICAN DAIRY purchased policies and
        paid premiums to HARTFORD in good faith and belief that
14      it was obtaining adequate commercial property insurance
        to protect it in the event of a loss such as what
15      occurred in May 2008.

16      . . . .

17      56. AMERICAN DAIRY reasonably and justifiably relied on
        the *representations, promises and statements made by
18      HARTFORD and its authorized representatives and agents
        because HARTFORD and its authorized representatives and
19      agents* represented that they had superior knowledge and
        were in a superior position to provide expert advice and
20      recommendations to AMERICAN DAIRY.

21      57. Based upon the *representations, promises and
        statements made by HARTFORD and its authorized
22      representatives and agents*, AMERICAN DAIRY was induced to
        purchase policies from HARTFORD and pay the required
23      premiums . . .

24      58. In addition, after the policy was issued, and based
        on the *representations and promises made in advance of
25      and during the April 9, 200[8] inspection*, AMERICAN DAIRY
        was lead to believe that if AMERICAN DAIRY's current use
26      and/or operation of THE PROPERTY increased the risk of
        loss or otherwise created a problem for coverage,
27      HARTFORD would have clearly and explicitly alerted and

28                                  23

1              advised **AMERICAN DAIRY** of the problem . . .

2         While American Dairy repeatedly pleads that "representations"

3    were made by "authorized" and "appointed" "agents" and

4    "representatives" American Dairy fails to specify the *content* of

5    the representations it is suing over, the identity of the agents

6    and representatives, *when* the representations were made (except for

7    the April 2008 representation), *what* precisely is *false or*

8    *inaccurate* about the representations and *why*. Because American

9    Dairy's counterclaim for negligent misrepresentation fails to

10   specify the necessary particular facts, it is insufficiently pled

11   under Rule 9(b). *See Kearns,* 567 F.3d at 1126 (concluding that

12   allegations of misrepresentation did not meet 9(b)'s requirements

13   because "the particular circumstances surrounding such

14   representations" were not provided, including the "who, what, when,

15   where, and how of the misconduct alleged"); *Vess*, 317 F.3d at 1106–

16   07 (concluding that allegations of a fraudulent conspiracy claim

17   failed to meet Rule 9(b)'s requirement because they did "not

18   provide the particulars of when, where, or how").

19        In opposition to the motion, American Dairy points to various

20   allegations it "incorporated by reference" into its negligent

21   misrepresentation claim which, according to American Dairy, provide

22   the necessary specificity. These incorporated allegations mention

23   the names of individuals such as "J. Helzer" and "Adam Bromhead"

24   who were "agents" and/or "representatives" of Hartford. These

25   allegations also describe some representations that were made. For

26   example, American Dairy points to paragraph 9 which states

27   "**HARTFORD'S** authorized and appointed representatives and agents

28                                  **24**

repeatedly assured **AMERICAN DAIRY** that the policy purchased from **HARTFORD** would provide full and complete coverage to **AMERICAN DAIRY** for losses that might be sustained to **THE PROPERTY**, notwithstanding the fact that no manufacturing or processing activities were ongoing." (Doc. 9 at 3.)[3]   These incorporated allegations also provide some dates and time-frames such as "at the time the policy was purchased" and "in advance of the April 9, 2008, meeting." (*Id.* at 3, 5.)

It is true that American Dairy's pleading contains some names, dates and time-frames, and the nature of some representations.  As Hartford notes in reply, however, American Dairy fails to "link" these allegations together and specify who said what to whom and when.  Alleging the names of X and Y, a few dates, and the content of some representations is not the same thing as alleging that X and Y made representations, when they did so, and what they each said.

---

[3]   **American Dairy also points to certain paragraphs which American Dairy suggests contain negligent misrepresentations but, in reality, these paragraphs concern alleged non-disclosure or concealment by Hartford, *i.e.*, Hartford's failure to speak up about a lack of coverage due to the vacant status of the Property.  A negligent misrepresentation claim is distinct from a fraud claim based on non-disclosure or concealment.   A negligent misrepresentation claim requires an "assertion" of that which is not true without a reasonable basis for believing it was true. *Conroy v. Regents of the Univ. of Cal.,* 45 Cal. 4th 1244, 1255 (2009); s*ee also Wilson v. Century 21 Great W. Realty*, 15 Cal. App. 4th 298, 306 (1993) (negligent misrepresentation requires a "positive assertion" or "assertion" of fact, and "[a]n implied assertion or representation is not enough") (internal citation and quotation marks omitted); *In re Daisy Sys. Corp.*, 97 F.3d 1171, 1181 (9th Cir. 1996).**

1    Even though American Dairy incorporates all its prior
2    allegations in its negligent misrepresentation claim, American
3    Dairy's pleading fails to specify which particular
4    "representations" it is relying upon to support its negligent
5    misrepresentation claim, the parties to these particular
6    representations, when these particular representations were made,
7    and what about these representations is false and why. American
8    Dairy's indiscriminate incorporation by reference of *all* its prior
9    allegations shifts the burden to the court to try to find the
10   elements of a coherent claim and leaves doubt about which
11   particular misrepresentations form the basis for the negligent
12   misrepresentation claim.

13        Various matters are asserted in American Dairy's pleading
14   that, arguably, could be considered a "representation," and it is
15   not clear whether American Dairy intends to rely upon them in
16   support of its negligent misrepresentation claim. For example,
17   American Dairy incorporates by reference, in its negligent
18   misrepresentation claim, the prior allegation that Hartford
19   "advised" American Dairy that Hartford "intended to conduct an on-
20   site inspection of the" Property for the "express purpose" of
21   "helping" to avoid "property losses." (Doc. 9 at 4, 13.) Even
22   though, by virtue of the incorporation, this conduct by Hartford is
23   part of the negligent misrepresentation claim, it is not clear
24   whether American Dairy considers this a "representation," what the
25   "representation" is and why it constitutes a negligent
26   misrepresentation. Hartford is not required to read between the
27   lines and attempt to ascertain what particular representations are

28

included in American Dairy's negligent misrepresentation claim. Under Rule 9(b), the pleader, American Dairy, is obligated to spell it out.

American Dairy has not sufficiently specified the particular representations that form the basis of its negligent misrepresentation claim, the parties to these representations, when these representations were made, what precisely is false or inaccurate about these representations and why. Because American Dairy's counterclaim for negligent misrepresentation fails to specify the necessary particulars, it is DISMISSED WITH LEAVE TO AMEND.

**B.    Reformation/Unilateral Mistake Claim**

Like the claim for negligent misrepresentation, Hartford argues that American Dairy's counterclaim for reformation/unilateral mistake also is devoid of the necessary particulars.  The reformation/unilateral mistake claim alleges, in part:

> **62.    AMERICAN DAIRY** reasonably believed and expected that the HARTFORD policy would contain complete coverage for property losses, such as burglary and vandalism losses, notwithstanding the fact that AMERICAN DAIRY's manufacturing and processing operations were delayed pending the required modifications and renovations to THE PROPERTY, and notwithstanding the fact that its renovation and modification efforts might be delayed for a period of more than 60 days pending obtaining necessary permits from the governmental authorities.

> **63.    HARTFORD**, and/or its authorized agents and representatives knew of the unilateral mistake at the time the HARTFORD policy was negotiated because it knew that the renovation and construction activities would take longer than 60 days to complete, and were in fact taking longer than 60 days to commence because of the need to obtain required permits from the governmental authorities.

On close examination, American Dairy's counterclaim does not specifically state what exactly constitutes "*the* unilateral mistake." Nevertheless, reading the two paragraphs together, a plausible interpretation of the pleading is that American Dairy alleges that "the unilateral mistake" was a belief that it was purchasing a policy that would provide coverage for losses, like the one it suffered, even if its Property remained under construction or renovation for more than sixty (60) days (i.e., despite its vacant status). But neither in its pleading nor in its opposition brief does American Dairy squarely state or confirm that this is "the unilateral mistake" at issue. Another paragraph in the reformation/unilateral mistake claim, paragraph 61, suggests that the "mistake" involves an "unaware[ness]" that the Policy "as written" contradicted "the terms" "intended and agreed to by the parties." (Doc. 9 at 15.) However, these "terms" are not described in the pleading. The nature of the unilateral mistake is not specifically defined.

Even assuming, *arguendo*, that American Dairy's pleading sufficiently identifies the nature of the unilateral mistake at issue, its pleading is still insufficient under Rule 9(b). American Dairy does not specify the circumstances of the unilateral mistake such as who at American Dairy made the mistake, when the mistake was made, and how the mistake occurred. American Dairy's incorporation by reference of all its prior allegations does not cure these deficiencies.

American Dairy's counterclaim for reformation/unilateral mistake is not pled with the requisite specificity under Rule 9(b).

**28**

1   This claim is DISMISSED WITH LEAVE TO AMEND.

2      In addition to its Rule 9(b) argument, Hartford contends that
3   American Dairy's counterclaim fails because it is not properly pled
4   in the alternative.   Hartford notes that, at the outset of the
5   counterclaim for reformation/unilateral mistake, American Dairy
6   "incorporates by reference" all previous allegations in its
7   pleading.   These incorporated allegations include the allegation
8   that there is coverage under the Policy.   This is in direct
9   conflict with the premise in American Dairy's claim for
10  reformation/unilateral mistake that there is no coverage.   These
11  allegations cannot be reconciled.   Hartford argues that the
12  contradiction or inconsistency created by American Dairy's
13  incorporation by reference pleading strategy, and American Dairy's
14  associated failure to properly plead in the alternative, renders
15  American Dairy's counterclaim for reformation/unilateral mistake
16  subject to dismissal for failure to state a claim.   In opposition,
17  American Dairy argues that the pleading should be construed as
18  asserting a reformation/unilateral mistake claim in the
19  alternative.

20     Hartford's argument is unpersuasive.   It has ignored or
21  overlooked key language in the pleading. The reformation/unilateral
22  mistake claim starts off with the incorporation by reference
23  allegation:

24         60. Counter-Claimant incorporates by reference its
25         allegations set forth in paragraphs 1 through 59,
           inclusive, of the Counter-Claim.

26  However, the next sentence includes a significant modifier:

27         61. *To the extent it is determined that the HARTFORD*

28

1
2
3

> *policy does not provide coverage* for AMERICAN DAIRY's May 2008 loss, it fails to reflect the true intent and agreement of the parties which is the result of a unilateral mistake on the part of AMERICAN DAIRY.

4  (Doc. 9 at 15.)  By alleging "to the extent it is determined" that

5  the Policy "does not provide coverage," American Dairy expresses

6  that it is pleading its reformation/unilateral mistake claim in an

7  alternative, even if inconsistent way, which is expressly permitted

8  by Rule 8(d)(2).

9      American Dairy's claim for breach of contract and, to some

10  extent, its claim for breach of the implied covenant of good faith

11  and fair dealing, is premised on the assertion that the Policy

12  provides coverage.    The "to the extent" language in the

13  reformation/unilateral mistake claim represents a "formulation from

14  which it can be reasonably inferred," *Holman*, 211 F.3d at 407, that

15  American Dairy is pleading this claim alternatively or

16  hypothetically – in the event the Policy does not provide coverage,

17  American Dairy pleads a claim for reformation/unilateral mistake.

18  *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice  &

19  Procedure § 1282 (3d ed. 2004) (generally an alternative claim is

20  drafted in the form of "either-or" and a hypothetical claim is in

21  the form of "if-then").   Because this language appears *after* the

22  incorporation by reference allegation, not before it, American

23  Dairy's claim is not internally inconsistent.

24      Hartford's argument that this claim is not properly pled in

25  the alternative is not persuasive and does not provide a separate

26  basis for dismissal.   The motion to dismiss on this ground is

27  DENIED.

28

**V.  CONCLUSION**

For the reasons stated:

**1.   Hartford's   motion   to   dismiss   American   Dairy's counterclaims   for   negligent   misrepresentation   and reformation/unilateral   mistake   on   the   grounds   that   these counterclaims are not pled with the particularity required under Rule 9(b) is GRANTED, and these counterclaims are DISMISSED WITH LEAVE TO AMEND.**

**2.   Hartford's   motion   to   dismiss   American   Dairy's counterclaim for reformation/unilateral mistake on the ground that this counterclaim is not properly pled in the alternative is DENIED.**

**Defendant has until December 24, 2009, to file an amended pleading.   If an amended pleading is timely filed, Plaintiff's responsive pleading is due by January 25, 2010.**

**Plaintiff shall submit a form of order consistent with this Memorandum Decision within five (5) days following electronic service of this decision.**

IT IS SO ORDERED.

**Dated:     November 25, 2009**              **/s/ Oliver W. Wanger**
                                                              UNITED STATES DISTRICT JUDGE

31