# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARTFORD CASUALTY INSURANCE COMPANY, <br><br>　　　　Plaintiff, <br><br>　v. <br><br>AMERICAN DAIRY AND FOOD CONSULTING LABORATORIES, INC., and DOES 1 through 10, inclusive, <br><br>　　　　Defendants. | 1:09-cv-0914 OWW SKO <br><br> ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY DEFENSE COUNSEL <br><br> (Doc. 21) |

Hartford Casualty Insurance Company ("Hartford") seeks to disqualify counsel for defendant American Dairy and Food Consulting Laboratories, Inc. ("American Dairy"), James Wilkins, Esq., and Mr. Wilkins' firm, Wilkins, Drolshagen & Czeshinski LLP ("WDC"), on the ground that Mr. Wilkins had previously represented Hartford. American Dairy filed an opposition on February 19, 2010. Hartford filed a reply on March 1, 2010. The matter came on regularly for hearing on June 4, 2010, in Courtroom 8 of the above-entitled court. Appearing on behalf of Hartford was counsel Catherine Rivard, Esq., of Mendes & Mount LLP. Mr. Wilkins appeared on behalf of American Dairy. Having considered the moving, opposition, and reply papers, as well as the arguments of counsel and the Court's file, the Court issues the following order.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1984 to 1997, Mr. Wilkins worked at McCormick, Barstow, Sheppard, Wayte & Carruth LLP ("McCormick"), a law firm that had represented Hartford. Hartford contends that Mr.

Wilkins provided legal services to Hartford while at McCormick from 1985 to 1995, while Mr. Wilkins asserts that his representation of Hartford ended in 1992.[1]

In May 2007, Hartford issued an insurance policy insuring American Dairy against direct physical loss to its property. In May 2008, American Dairy suffered vandalism and theft on its property. On May 22, 2009, Hartford denied coverage based on a vacancy limitation in the policy because the property was allegedly vacant for more than sixty (60) days before the reported theft and vandalism. (Amended Complaint, Exh. B).

Ultimately, Hartford filed suit against its insured, American Dairy, in May 2009, seeking a declaration that it was entitled to refuse coverage to American Dairy under the terms of the policy and that it is entitled to rescind the policy. On July 24, 2009, American Dairy, represented by Mr. Wilkins, answered and filed a counterclaim for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and reformation due to unilateral mistake. On December 23, 2009, American Dairy amended its counterclaim to include a cause of action for fraud and concealment.

## II.

## LEGAL STANDARD

A motion to disqualify counsel implicates two competing issues: the current client's right to the attorney of its choice versus the need to maintain ethical standards of professional responsibility. *Jessen,* 111 Cal. App. 4th at 705; *see also People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.,* 20 Cal. 4th 1135, 1145 (1999). Counsel has an unquestionable duty to its former client to ensure the permanent confidentiality of matters disclosed to counsel in the course of any prior representation. *Derivi Constr. & Architecture, Inc. v. Wong*, 118 Cal. App. 4th 1268, 1272-73 (2004). At the same time, a court must be mindful that where there is not a legitimate risk of the use of confidential material, a litigant may not seek disqualification of his former counsel in order to gain

---

[1] Mr. Wilkins' assertion of the time frame is consistent with the court's determination in *Jessen v. Hartford Casualty Insurance Co.*, 111 Cal. App. 4th 698 (2003), another case in which Hartford moved to disqualify Mr. Wilkins. *See id.* at 704 n.1.

2

a tactical advantage. *See Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985) ("Because of this potential for abuse, disqualification motions should be subjected to 'particularly strict judicial scrutiny.'"); *City & County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 851-52 (2006). Ultimately, however, the Court's "paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *SpeeDee Oil*, 20 Cal. 4th at 1145.

Rule 3-310 (E) of the Rules of Professional Conduct of the State Bar of California prohibits the successive representation of clients in certain circumstances without the informed written consent of the current client and former client. The rule provides:

> A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

The California Supreme Court has held, in interpreting Rule 3-310(E), that, "[w]here an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation." *SpeeDee Oil*, 20 Cal. 4th at 1146. The burden is on the party seeking the disqualification to establish by a preponderance of the evidence that a substantial relationship exists. *See H.F. Ahmanson & Co. v. Salomon Bros.,* 229 Cal. App. 3d 1445, 1452 (9th Cir. 1991); *see also In re Charlisse C.*, 45 Cal. 4th 145, 166 n.11 (2008).

Here, the parties agree that the applicable standard for determining whether disqualification is warranted is the "substantial relationship" test. *See Trone v. Smith,* 621 F.2d 994, 998 (9th Cir. 1980). In determining whether there is a substantial relationship between successive representations, "a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation." *Cobra Solutions*, 38 Cal. 4th at 847 (*citing Jessen*, 111 Cal. App. 4th at 710-11). For purposes of a disqualification motion, a

"direct" professional relationship is defined as a relationship "where the lawyer was personally involved in providing legal advice and services to the former client." *Jessen*, 111 Cal. App. 4th at 709. If the former representation was direct, "the former client need not prove that the attorney possesses actual confidential information." *Cobra Solutions*, 38 Cal. 4th at 847 (*citing Jessen*, 111 Cal. App. 4th at 709). "Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel." *Id.*

When faced with a direct relationship between a former client and the attorney, the court cannot delve into the specifics of the communications between the attorney and the former client in an effort to show that the attorney did or did not obtain confidential information during the course of that relationship. As result, disqualification will depend on the *strength* of the similarities between the legal problem involved in the former and the current representations. *Jessen*, 111 Cal. App. 4th at 885. As the California Court of Appeal has clarified, when the attorney had a direct relationship with the client in the first representation, "the *Jessen* evaluation of whether the two representations are substantially related centers *precisely upon the factual and legal similarities of the two representations*." *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 679 (2004) (emphasis added); *see also Jessen*, 111 Cal. App. 4th at 709-10.[2] Although a substantial relationship does not necessarily mean an exact match between the facts and issues involved in the two representations, only when the information acquired during the prior representation "will be directly in issue or of unusual value in the subsequent matter will it be independently relevant in assessing a substantial relationship." *Farris*, 119 Cal. App. 4th at 680. The courts look at the

---

[2] When there was no direct representation, the court also considers the nature of the attorney's past relationship with the former client. *Farris,* 119 Cal. App. 4th at 680; *Jessen*, 111 Cal. App. 4th at 710-11. Some courts continue to cite *Ahmanson's* three-part substantial relationship test. *Openwave Sys., Inc. v. 724 Solutions (US) Inc*., 2010 WL 1687825, at * 2 (N.D. Cal. Apr. 22, 2010). The Court finds both *Jessen* and *Farris* persuasive authority for the proposition that once a direct and personal relationship is found, the relevant inquiry is the factual and legal similarities between the former and current representations; such inquiry does not include an assessment of the nature and extent of the attorney's involvement with the cases. Having said that, a consideration of the nature and extent of the attorney's involvement would not change the Court's conclusion here, given the changes in Hartford's policies and the significant lapse of time. *See* discussion in Section III, *infra*.

4

practical consequences of the attorney's representation of the former client, and ask whether confidential information *material* to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation. *Ahmanson*, 229 Cal. App. 3d at 1454; *see also Trone,* 621 F.2d at 1000-01. To create a conflict requiring disqualification, *Jessen* mandates that the information acquired during the first representation be *material* to the second – that is, be directly at issue in, or have some critical importance to, the second representation. *Farris,* 119 Cal. App. 4th at 680.

On the other hand, exposure to "general 'play book' information" such as a former client's general litigation or settlement strategy is not sufficient to disqualify an attorney from an adverse successive representation. *See id.* at 688. "[O]nly when such information will be directly in issue or of unusual value in the subsequent matter will it be independently relevant in assessing a substantial relationship." *Id*. at 680 (quotation marks omitted). Accordingly, the attorney's acquisition during the former representation of general information about the former client's "overall structure and practices" would not of itself require disqualification unless it were found to be "material" – i.e., directly at issue in, or of critical importance to, the second representation. *Id.* "The same is true about information such as the first client's 'litigation philosophy' or 'key decision makers.'" *Id*.

## III.

## DISCUSSION

**A.    Mr. Wilkins' Relationship With Hartford Was Direct and Personal**

According to Hartford, Mr. Wilkins represented Hartford for 10 years, advised Hartford on at least 16 insurance coverage matters including two bad-faith lawsuits, and represented Hartford in at least two actions for declaratory relief. *See also Jessen,* 111 Cal. App. 4th at 704 ("Wilkins worked on no less than 17 matters for which McCormick was counsel for Hartford."). Mr. Wilkins characterizes his representation of Hartford during those years as "limited" or "minimal," only involving the analysis of specific facts to specific cases in rendering coverage opinions; he was not involved in establishing Hartford's companywide claims handling practices and procedures. Mr.

5

Wilkins contends it would have been unnecessary for him to have been involved with any review, analysis or discussion of an insurer's specific claim file handling or bad-faith litigation strategies, practices or procedures.

Despite these differences, the parties agree that Mr. Wilkins' relationship with Hartford was direct and personal. The only remaining issue, therefore, is whether there was a substantial relationship between what Mr. Wilkins did for Hartford in prior actions and what it seeks to do for American Dairy in this case.

**B.    Hartford Has Failed to Meet Its Burden of Proving That the Prior Matters and the Current Litigation Are Substantially Related**

Hartford argues that American Dairy's counterclaim implicates numerous legal issues that are identical to issues implicated in coverage opinion matters Mr. Wilkins handled for Hartford more than fifteen years ago. Specifically, Hartford identifies two claims from insureds: the '087 and '435 claims. (Pl.'s Mot. at 17-18, 20.) Hartford explains that the similarities between the '087 and '435 claims (with loss dates in 1989) and this case include the fact that those claims arose from events relating to "property damage caused by theft/vandalism." (Pl.'s Mot. at 17, 20.) Hartford further argues that American Dairy's claims here "are identical" to two bad-faith matters (*Brown & Bryant v. Hartford* and *Duarte v. Hartford*) with which Mr. Wilkins was purportedly involved while at McCormick.[3] (Pl.'s Mot. at 7-8.) In support of this argument, Hartford asserts that the prior matters and the present matter involved an analysis of issues relating to imputation of the agent's knowledge to the insurance company, the insurer's potential liability for the agent's misrepresentations, estoppel and waiver issues arising from an insurer's allegedly inconsistent conduct, and issues relating to reformation based on the insured's unilateral mistake. (Pl.'s Reply at 5-6.) Because of these

---

[3] The *Brown* matter, filed on May 27, 1986, arose out of a tender for coverage of an environmental matter and the Department of Health Services' efforts to compel Hartford's policy holder to undertake remedial efforts. As to the breach of the covenant allegations, plaintiff Brown & Bryant alleged misrepresentation of the policy provisions and coverages at issue, unreasonable delays in acting upon plaintiff's claim, unreasonable and improper investigation of plaintiff's claim, violation of the California Insurance Code, and unfair claims practices in handling the claim. The *Duarte* matter filed in 1980, four years before Mr. Wilkins joined McCormick Barstow, alleged breach of contract and breach of the covenant for Hartford's failure to post an appeal bond or to pay a judgment entered against its insured. The insured tendered the underlying litigation to Hartford just prior to entry of a $150,000 judgment, and Hartford declined coverage and indemnification. (Def.'s Opp. at 9-10; *see also Lozano Smith v. Hartford Cas. Ins. Co.,* No. CV-F-00-7039 REC LJO at 6-7 (E.D. Cal. filed May 1, 2001); *Johnston v. Hartford Cas. Ins. Co.*, No. CV-F-00-6051 OWW DLB at 8 (E.D. Cal. filed May 2, 2001).)

6

1  similarities, Hartford argues that those matters are substantially related to the current litigation and
2  require Mr. Wilkins' disqualification.

3        **1.      Claims '087 and '435 Are Not Factually and Legally Similar Such That There Is a Substantial Relationship Between Those Matters and the Present Case**

4        Hartford's argument is an overly broad characterization of the factual and legal similarity
5  standards. First, rendering a coverage opinion does not involve a review of corporate policies or
6  procedures. The billing statements provided by Hartford as evidence of Mr. Wilkins' work on
7  Hartford's behalf do not show any review or analysis of such corporate policies. The evidence
8  corroborates Mr. Wilkins' contention regarding the limited nature of his coverage work; he reviewed
9  the claim file to determine the nature of the claim and the policy, conducted legal research, and
10 drafted the coverage opinion. (*See* Pl.'s Mot. at Ex. G, Myman Decl. Exs. G, J, L, M, P, Q, U, W,
11 Z, CC & FF.)

12       Second, rendering a coverage opinion involves a review of the specific policy and the specific
13 claim and applying the facts to the policy. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 n.15 (1966)
14 ("[T]he ultimate question is whether the facts alleged do fairly apprise the insurer that plaintiff is
15 suing the insured upon an occurrence which, if his allegations are true, gives rise to liability of
16 insurer to insured under the terms of the policy."). By its very nature, whatever coverage work was
17 done by Mr. Wilkins for Hartford many years ago in the '087 and '435 matters will necessarily differ
18 substantially from the current matter because it relates to a different policy with a different insured
19 and a different loss. Moreover, the basis for Hartford's denial of coverage here is different from the
20 '087 claim which Hartford conceded at the hearing did not involve a specific vacancy provision;
21 in the '435 claim there was no denial of coverage at issue at all. Pl.'s Mot. at 6:22-24 ("At issue in
22 the '435 Claim was whether payment should have been made to the named insured, who leased the
23 damaged equipment, or the lessor, who was named as a loss payee on the policy.").

24       Third, while the prior coverage opinion work Mr. Wilkins performed in relation to the '087
25 and '435 matters and the work performed in the current litigation may involve general issues related
26 to the insurer's liability, that does not make the former and the current representations legally similar.
27 Although the '087 and '435 coverage matters involved claims for property damage due to
28 theft/vandalism, the issues in the present case involve determinations whether the vacancy limitation

applies to preclude coverage, which was not at issue in either the '087 or '435 claims, and whether Hartford is entitled to rescind the policy on the basis of its insured's alleged misrepresentations at the time of the purchase of the policy, which does not appear to have been at issue in either the '087 or '435 matters.

In summary, the coverage work performed by Mr. Wilkins in the '087 and '435 matters is not substantially related to the current matter. The prior coverage opinion work did not involve a review of Hartford's corporate policies and procedures. Coverage opinion work is limited in scope and typically relates only to the particular policy and the specific facts of that case. Further, the legal issues actually involved in the '087 and '435 matters differ from those in this case – no vacancy limitation was involved in either matter, there was no question about the rescission of the policy based on statements made by the insured, and here, unlike in the '435 matter, there is no issue related to an additional insured or a loss payee. General legal issues about the scope of coverage and the mutual understanding of the parties regarding the terms of the policy will be at issue in virtually every insurance claim dispute. In fact, such issues will be encountered in nearly every contract dispute. That generality does not, ipso facto, mean all insurance coverage cases are substantially related. Given the factual and legal differences between the '087 and '435 matters and the present case, the Court cannot conclude that they are substantially related to the current American Dairy litigation.

**2.   *Brown* and *Duarte* Are Not Factually and Legally Similar Such That There Is a Substantial Relationship Between Those Matters and the Current Litigation**

Beyond the coverage opinion work performed by Mr. Wilkins in relation to the '087 and '435 matters, Hartford claims that Mr. Wilkins' work on two bad-faith matters, *Brown & Bryant v. Hartford (Brown)* and *Duarte v. Hartford (Duarte),* is substantially related to the current matter. The factual dissimilarity between *Brown* and *Duarte* and this case is apparent. As previously stated, the *Brown* matter, filed on May 27, 1986, arose out of a tender for coverage of an environmental matter and the Department of Health Services' efforts to compel Hartford's policy holder to undertake remedial efforts. *Duarte* involved a third-party claim against the insured, which was filed four years before Mr. Wilkins even began work at McCormick. The current matter relates to a first-

party coverage dispute involving a vacancy limitation that precludes coverage for theft under certain circumstances, not an environmental clean-up matter or a third-party claim against American Dairy as in *Brown* and *Duarte*. Factually, the *Brown* and *Duarte* matters are not related to the current litigation.[4]

Any legal similarities between *Brown* and *Duarte* and the current case are attenuated. More than twenty years have passed between the *Brown* and *Duarte* matters and this litigation. While the passage of time alone has little to do with whether the former litigations are substantially related to the current matter, what has changed during the passage of time does affect the inferences the Court may make about the legal similarities between the cases and the materiality of any similarity that might exist. Insurance policies issued by insurers are subject to substantial modification over time, the decisional law interpreting various provisions of policies has evolved, and here, Hartford's own practices have changed with the passage of more than twenty years since *Duarte* and *Brown* were litigated.

As Hartford acknowledges, standardized forms for certain types of insurance policies have been developed and distributed by the Insurance Services Office ("ISO"). *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993). The ISO develops standard policy forms and files and lodges them with each State's regulators. Most commercial liability insurance is written on a standard form, the "Commercial General Liability Policy," commonly known as the "CGL form." H.W. Croskey, M. Kaufman, D. Casselman, R. Heeseman, T.W. Johnson, and P. Kelly, *California Practice Guide–Insurance Litigation*, Chapter § 7:10.[5] As Hartford acknowledged during oral argument, insurance policies are governed by statutory and decisional law in force at the time the policy is issued as well as subsequent decisional law which can relate to, and affect, the interpretation of the policy. There can be no question that any changes in the law during the past

---

[4] The *Lozano* court also found that in *Duarte*, Mr. Wilkins was "only involved with answering interrogatories," and in *Brown*, Mr. Wilkins' involvement "consisted of responding to discovery, coordinating with other insurance carriers and assisting in settlement. He was not the lead attorney." *Lozano*, *supra*, at 6 n.2.

[5] Even if the policies at issue in the current and former representations are not standard form policies but instead forms drafted by Hartford, the rules governing policy interpretation are the same; thus, changes in the law will affect policies drafted by Hartford in the same manner as form policies.

9

fifteen to eighteen years will most certainly impact Hartford's approach toward coverage and its determination of whether coverage is available under a specific policy.

Citing *Brand v. 20th Century Insurance Co./21st Century Insurance Co.,* 124 Cal. App. 4th 594 (2004), Hartford argues that a significant lapse of time between the former and current representation has no bearing on whether a "substantial relation" exists because "such an inquiry necessarily would require a prohibited analysis of the confidential information itself." (Pl.'s Reply at 8.)

In *Brand*, the California Court of Appeal held that an attorney who was previously personally involved in providing legal advice and services to an insurer in a matter *substantially related* to subsequent litigation was barred from testifying as an expert against the insurer, as "[t]he passage of 12 years between the two engagements did not neutralize [the attorney's] representation in the first case." 124 Cal. App. 4th at 607. The court in *Brand* acknowledged that, under *Farris*, a prior substantial relationship may be eliminated by the passage of time, but was not persuaded that the passage of time in the two substantially related cases was sufficient to overcome the presumption that the attorney had acquired confidential information during his representation of the insurer. *Id.* at 607 n.5.

Thus, *Brand* does not stand for the proposition that time has no bearing on the determination whether a substantial relationship exists. If this Court concluded that the former representation of Hartford by Mr. Wilkins was substantially related to the present litigation, Hartford would be correct – the mere passage of time between successive representations would not mitigate the relatedness of the two matters. Although time does not overcome or rebut a substantial relationship once it arises, *Brand* does not preclude the passage of time from factoring into the determination whether a substantial relationship exists in the first place. *Id.* at 607.

Here, the lapse of time since the prior representations makes it highly unlikely that any exposure to the formulation of litigation policy or strategy could be used in the American Dairy case. This is especially true since Hartford's applicable claims manual, the "Claims Best Practices" manual (Manual), was first distributed for use on March 3, 1997, after Mr. Wilkins left McCormick, was subject to constant updating and revisions, and continues to be revised. (*See* Wilkins Decl.

10

¶ 30.)[6] Given the Manual and its revisions, it is reasonable to conclude that any confidential information Mr. Wilkins may have gained in his previous representation of Hartford is stale and irrelevant, and not material, to his current representation. As the Court noted in *Lozano*, "[i]t would be absurd for the Court to ignore the passage of time when it is demonstrated that substantial changes in the alleged confidential information have occurred during the passage of time." *Lozano*, *supra*, at 13.[7] In light of the revisions over the past thirteen years, it is simply unrealistic to infer that any policies and procedures with which Mr. Wilkins may have been familiar during his work for Hartford could be applied in the present case or used by Mr. Wilkins to materially advance American Dairy's position.

The *Farris* case cited by Hartford is also distinguishable. In *Farris*, Fireman's Fund Insurance Company ("FFIC") successfully sought to have Mr. Wilkins and WDC disqualified because he had access to confidential information material to the action against FFIC alleging bad faith and breach of contract. The injuries from which that case arose occurred in late 1997, and Mr. Wilkins left McCormick in October 1997 – barely six months before the insured tendered the

---

[6] Hartford has not availed itself of several opportunities to dispute that the Manual was first distributed for use on March 3, 1997, was redrafted at least once since that time, and has undergone other revisions. It claims instead that any reliance on the Manual is misplaced because it is confidential and irrelevant to the determination as to whether disqualification is warranted in this case. Hartford's argument is not persuasive. The existence of the Manual, the fact that it has been revised, and Mr. Wilkins' lack of involvement in the development of the Manual are highly relevant in determining whether any information acquired during his representation of Hartford is "material" to his current representation of American Dairy.

[7] Hartford's contention that this Court should strike defendant's opposition because Mr. Wilkins "violated a protective order" by referring to the "Best Practices Manual" and nine pages of a deposition transcript is not well taken. At the hearing, Hartford's counsel was unable to identify which provisions of the protective order had been violated. In any event, Mr. Wilkins did not cite to any information contained in the Manual. Instead, he simply referred to the fact that the Manual was "first distributed for use on March 3, 1997," "was developed by Hartford's Field and Home Office representatives," and "includes numerous provisions which were issued after the March 3, 1997 initial distribution date." (Wilkins Decl. ¶ 30.) In his declaration, Mr. Wilkins specifically acknowledged that, although he currently has a complete copy of the Manual, he is "precluded from producing it" because of the protective order. *(Id.)*

The Court also notes that prior courts reference the Manual in denying Hartford's motion to disqualify Mr. Wilkins in those cases. *See Johnston*, *supra*, at 11; *Lozano*, *supra*, at 13; *see also Johnston*, No. CV-F-00-6051 OWW DLB, at 14 (E.D. Cal. filed July 13, 2001); *Lozano*, No. CV-F-00-7039 REC LJO, at 13, 15 (E.D. Cal. filed June 22, 2001) (district judges' orders denying reconsideration of magistrate judges' denial of motions to disqualify). Similarly, the deposition transcript was filed as an exhibit to Mr. Wilkins' declaration in the 2002 Fresno County Superior Court case, *Jessen v. Hartford Casualty Insurance Co.*, No. 02CECG00291; that document has been part of the public record ever since. *See United States v. Int'l Bus. Machs. Corp.*, 67 F.R.D. 39, 40 (S.D.N.Y. 1975) (denying protective order when information had already been made public).

11

defense to FFIC in April 1998. 119 Cal. App. 4th at 686. The court found that Mr. Wilkins had done substantial work for FFIC during his time at McCormick, and provided ongoing legal advice on coverage issues to key FFIC decision-makers in more than two hundred coverage claims over an extended period of time. *Id*. In concluding that a substantial relationship existed, the court's opinion rested primarily upon the following:

> Wilkins's pervasive participation, and indeed his personal role in shaping, FFIC's practices and procedures in handling California coverage claims, practices and procedures that, given the short time span between Wilkins's departure from McCormick and Farris's request for a defense from FFIC, were likely to have been in place when FFIC rejected the tender and thus directly in issue in this case.

*Id.* at 688.

Here, by contrast, there is no evidence that Mr. Wilkins had a role in shaping Hartford's previous practices and procedures that was as pervasive and personal as his involvement with FFIC. Moreover, there is no evidence that Hartford's practices and procedures from 1985 to 1992, or even 1995, were in place when Hartford denied American Dairy's claim in 2009. Additionally, the passage of more than fifteen years has attenuated the relationship between the subjects of Mr. Wilkins' representations of Hartford and American Dairy. As the court noted in *Farris*,

> We certainly can envision circumstances where the passage of time might be shown to have eliminated a prior substantial relationship due to such events as changes in corporate structure, turn over in management, and the like.

*Id.* at 686.

Given the changes in policies, decisional case law related to policy provisions, and Hartford's practices since Mr. Wilkins' work for Hartford on *Duarte* and *Brown*, the Court cannot conclude that the prior matters are substantially similar to the current litigation as to require Mr. Wilkins' disqualification as counsel for American Dairy. While litigation over coverage disputes involving allegations of bad faith on the part of the insurer will share certain common elements, those elements do not make every bad-faith litigation substantially similar to the next regardless of relevant changes over time and the factual contexts of the litigations. Such a finding would render the substantial relationship test a nullity – courts would merely look to the general topic of the litigations, and there would be no need to consider the factual and legal similarities between the representation in the former matter and the representation in the current matter.

Moreover, the *Brown* and *Duarte* cases arose in different factual contexts involving issues of third-party claims and coverage issues related to environmental clean-up matters. The factual contexts of those cases are different from the current coverage dispute, and thus coverage denial in those cases was presumably based upon very different factors. Any similarity of legal issues between those matters and the current case is generic to bad-faith litigation generally and attenuated by all that has changed since Mr. Wilkins' participation in *Duarte* and *Brown*. For those reasons, the Court concludes that *Duarte* and *Brown* are not substantially related to the matter currently pending before the Court.

**C.     Hartford's Overly Broad Characterization of the Substantial Relationship Standard Is Not Supported by Legal Authority**

During the oral argument, the Court questioned Hartford's counsel whether anyone who represented an insurance company should subsequently be allowed to represent anyone else against that insurance company. Hartford's counsel responded:

> I actually don't think that someone who has represented an insurance company in coverage and bad-faith litigation should ever be allowed to sue that insurance company on behalf of another client. Now, if someone had represented an insurance company doing their securities work [or] handling their real estate transaction, that is a scenario in which I could see an attorney later bringing bad-faith actions because it's not involving the broader legal and factual issues that would have necessitated learning a lot of detail about the client that would be very, very relevant.

Hartford's argument is an overly broad and inaccurate characterization of the substantial relationship standard.

In *Farris*, the court specifically rejected the notion that *Jessen* created a lifetime prohibition against representation adverse to a former client. After noting that an attorney's acquisition of general information about the first client's "'overall structure and practices' would not of itself require disqualification unless it were found to be 'material,'" *Farris* explained,

> [f]or these reasons, *we do not regard* Jessen *as creating a lifetime prohibition against representation adverse to a former client, treating the former in the same fashion as current client*, or automatically mandating disqualification where the two compared matters are entirely unrelated.

*Farris*, 119 Cal. App. 4th at 680 (emphasis added).

In two separate orders issued more than nine years ago, this Court similarly rejected the overbroad characterization of the substantial relationship test advocated by Hartford:

13

> If the court were to accept Hartford's contention that each of the prior matters that involved interpretation of insurance policies are substantially similar to the present case, every attorney who specializes in a particular area of the law would be forever foreclosed from representing a client adverse to a former because the topic is the same.

*See Johnston, supra,* at 8 (filed May 2, 2001) (*citing Ahmanson,* 229 Cal. App. 3d at 1453); *see also Lozano, supra,* at 9 (filed May 1, 2001) (plaintiff's "argument would preclude an insurance defense attorney from ever representing an insured, regardless of the scope of the attorney's work for the insurer, because the attorney had once reviewed a standardized insurance policy").

As the Court explained in *Ahmanson*, an overbroad characterization of the substantial relationship test and disqualification standard may stifle the development of expertise in complex areas of the law. *See Ahmanson,* 229 Cal. App. 3d at 1453.

**IV.**

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion to Disqualify Counsel James Wilkins is DENIED.

IT IS SO ORDERED.

**Dated:   June 16, 2010**          /s/ Sheila K. Oberto
                                    UNITED STATES MAGISTRATE JUDGE